In the Matter of LOUIS L. KATZ, an Attorney, Respondent.
First Department, April 11, 1930.

*Isidor J. Kresel* of counsel [*Harold Harper* and *Vincent P. Uihlein* with him on the brief], for the petitioners.

*Henry Clay Greenberg* of counsel, for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on November 17, 1924.

The respondent is charged with having participated in a scheme and conspiracy to defraud an insurance company by the assertion as attorney against a fictitious assured of certain baseless claims for personal injuries and property damages alleged to have been sustained by the negligent operation of a certain automobile, which automobile the conspirators had caused to be insured with the company against liability.

Upon respondent's answering the petition herein, the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon to this court. The learned referee has duly filed his report and petitioners move for such action thereon as the court may deem just and proper.

Respondent's present predicament is due to his association with Daniel Laulicht, Benjamin Laulicht, William Spiegel and Joel Kirschner. Kirschner was formerly a member of the bar, but was disbarred by this court following his plea of "guilty" of an attempt to commit the crime of grand larceny in the second degree. This court has also had occasion to review the activities of the Laulichts and Spiegel in connection with the so-called "flop" cases (See *Matter of Kopleton*, 229 App. Div. 111, herewith decided), and to consider their record in other disciplinary proceedings growing out of the Ambulance Chasing Investigation.

It appears that there was caused to be issued by the Massachusetts Bonding and Insurance Company policy numbered AV355765 dated December 21, 1926, covering $5,000 and $10,000 liability, in which the assured's name is given as Bernard Lobisch, residing at 1741 Washington avenue, Bronx, N. Y., covering a Studebaker sedan, model 1924, factory number 70594. The name of the assured is fictitious. Following the issuance of this policy and on January 17, 1927, a letter was dictated by respondent and written on his letter head addressed to Bernard Lobisch in which there was asserted a claim for personal injuries and property damage to an automobile, on behalf of Herman Lotz, and for personal injuries on behalf of Cecil Weinshank, Elsie Korn, Mildred Extor and Beatrice Chernisky, growing out of a collision which, it was stated, occurred at Avenue A and Sixty-eighth street, on or about January 15, 1927, when the Lobisch car is supposed to have collided with the Lotz car. No such accident occurred. And although there is an individual named Herman Lotz who owns an automobile, he never knew about the use of his name. The other names used are fictitious. This letter was forwarded to the insurance broker and eventually to the insurance company. Thereafter Lipton, the investigator for the insurance company, submitted a report to the latter of an alleged interview with Wolfe, the supposed driver of the Lobisch car, in which Lipton reported that Wolfe had told him: "I misjudged my distance." Lipton added: "Of course, I did not wish to put this in his statement." In the same report Lipton set forth an alleged interview with Herman Lotz, purporting to give the substance of his conversation with him, which is supposed to have taken place at No. 16 Second avenue. Lotz does not live at No. 16 Second avenue, nor does it appear

that any one connected with this case lived there. A repair bill covering the items of damage to the claimant's car was prepared and sent to Lipton. Lipton submitted this repair bill to the insurance company with a report of a supposed interview with the mechanic listed on the repair bill as the creditor; Lipton reported that this mechanic had stated " that his estimate was a very low one." On February 8, 1927, physical examinations of the alleged claimants were had at respondent's office by a physician purporting to represent the insurance company. Four girls and a man impersonated the claimants. Respondent was present during part of the time at the physician's examination, such as it was. The reports of the doctor covering the examination were produced from the insurance company's file. The day after the physical examinations were had Kirschner, Spiegel and both Laulichts were arrested charged with the crime of grand larceny. Two days later, February eleventh, respondent wrote the insurance company " after a careful investigation of the facts herein I wish to notify you of the fact that I am withdrawing from these claims and trust that you will mark your records accordingly." Under date of February 15, 1927, Lipton reported to the insurance company: " There has been a doubt in my mind as to the honesty of these claims and I have been waiting developments and on Friday, February 11th, 1927, I called at the attorney's office, Louis Katz, and told him that it would be advisable to him to drop this case as it did not look on the level. The attorney then stated that he was not the official attorney of record, that he was asked to handle these cases by some one else and that upon my suggestion he would immediately send in a letter to our Mr. Vassar. The attorney promised to do this without fail."

There are two versions of respondent's connection with this scheme. Daniel Laulicht testified that he was introduced to the respondent by Samuel Kopleton; that soon thereafter Kopleton, in Laulicht's presence, told the respondent of Laulicht's success in concocting fraudulent claims; thereupon respondent suggested to Laulicht that he and Laulicht " frame " a case against the Massachusetts Bonding and Insurance Company. The respondent told Laulicht that he was acquainted with one Lipton, an investigator for the company, and was thus assured of a quick money settlement. Daniel Laulicht testified he had no previous acquaintance with Lipton, but he was agreeable to respondent's suggestion. At Lipton's suggestion and for his protection, it was decided that an actual automobile be registered, and a living chauffeur be provided for Lipton to interview. That respondent furnished Laulicht with money for the purchase of the car which was to be

at fault in the accident. The automobile was insured against liability in the Massachusetts Bonding and Insurance Company. The name " Herman Lotz," to be used as the owner of the damaged automobile and one of the plaintiffs, was furnished by Daniel Laulicht from the files of Kirschner, whose office had formerly represented a man of that name in an action for property damage. The names of the other plaintiffs were selected at random. Then, in Laulicht's presence, respondent dictated the claim letter and they forwarded it to the insurance broker. A few days later, Daniel Laulicht, Spiegel, Irving Wolfe, the alleged chauffeur of the insured car, and Lipton, the insurance company's investigator, met in a restaurant on Twenty-third street, and prepared a statement which was signed and sworn to by Wolfe. Lipton submitted this statement to his company with his report covering his alleged interview with the alleged chauffeur, and with the alleged claimant. Thereafter respondent in his office and in the presence of Daniel Laulicht prepared the alleged repair bill. Respondent made up this bill by copying a bill of repairs which was in the files in his office and which had been used in another accident. This repair bill was sent to Lipton who submitted it to his insurance company with a report of a supposed interview with the auto mechanic. When the physical examination was arranged, four girls and a man met at Kirschner's office where each was given a slip of paper; each slip of paper contained the name of the claimant whom the individual was to impersonate, together with a list of the injuries supposed to have been suffered by him; they were instructed to commit this information to memory; they then went to respondent's office, and the physical examination was had.

Respondent's version is that he was admitted to practice in November, 1924, and occupied offices at 305 Broadway, New York, until January 30, 1926, at which time he removed to 2 Lafayette street. About one month prior to removal, he leased the room in 305 Broadway to Samuel Kopleton, an attorney; that a man from Kirschner's office asked Kopleton to try a case for Kirschner the following morning; on this point respondent's testimony is: " * * * Mr. Kopleton replied in my presence that he was engaged in another court and could not very well handle the matter for Joe Kirschner. Mr. Kopleton then turned to me and he asked me whether I would have any objection to try the case for Joe Kirschner." The man from Kirschner's office was Benjamin Laulicht. Respondent further testified: " I replied that I had nothing to do the following morning and would gladly try it. I asked this gentleman what kind of a case it was. He replied by telling me it was a negligence case in the Fourth Manhattan

against the Yellow Taxi Corporation." Respondent tried the case, recovered a verdict, and later Benjamin Laulicht delivered a check to him for services rendered. Some time later Benjamin Laulicht stated to respondent that Kirschner wanted to know if respondent would have any objection to being attorney of record in a certain case. Respondent had a telephone conversation with a man he supposed to be Kirschner about the case; Kirschner stated that claimants were friends of the plaintiff in the action respondent had tried for him and they wanted respondent to handle the case. Kirschner gave the facts to respondent over the wire and promised to send the file to respondent the following morning. Respondent then dictated the claim letter. " And then I believe I had my girl send the letter. I gave it to her to mail and which she must have mailed in the usual course of business." Benjamin Laulicht asked him for a copy of the letter which he said he was to show to Mr. Kirschner, and respondent gave it to him. On January 18, 1927, respondent, accompanied by one Louis Bayme, called at Kirschner's office. Daniel Laulicht was in the right-hand room. Respondent claims that is the first time he ever met Daniel Laulicht. Respondent asked for Mr. Kirschner and a certain file which he had promised to deliver to respondent. Daniel Laulicht asked for respondent's name and stated he would give Kirschner the message. Respondent never received the file. Some time later Lipton, of the Massachusetts Bonding and Insurance Company, called at respondent's office for the facts in the case; he was advised that respondent was handling the case for Joel Kirschner and had been told to call on respondent for facts. The physical examination was arranged by Kirschner's office and respondent was notified the day before the date of the examination. The claimants and Benjamin Laulicht and William Spiegel called at respondent's office for examination. One of the claimants was interrogated by respondent in the presence of the other claimants and Laulicht as to the manner of the accident. That two or three days after the physical examination, Lipton, the investigator, " called at my office and told me that he believes the cases look fishy to him, and asked me what I am going to do about them. I told him at the time that he knows — that I am just the attorney of record handling them for Kirschner, and that I would communicate with Mr. Kirschner and let Mr. Lipton know in a day or so just what I am going to do." He said, " All right, I will expect a reply from you." Either the same day or a day or two later respondent sent the letter withdrawing from the case. He did not communicate what Lipton had told him to Kirschner.

Samuel Kopleton, while at first giving a different picture of the

occasion when Benjamin Laulicht met respondent in the office on the seventh floor of 305 Broadway, finally conformed his testimony to that of respondent, stating: " I will say it is if Mr. Katz says it is." Kopleton was associated with this notorious group for a period of some six weeks in 1925, about a year before the alleged first meeting between Benjamin Laulicht and respondent. He well knew the character of the group. His failure to warn respondent thereof was inexcusable.

There are developed in the record features of the case which cast a doubt on respondent's version of his association with the Laulicht group. The learned referee very carefully analyzed the testimony. After doing so he states in his report: " I cannot accept, as at all probable, the testimony of the respondent as to either the circumstances under which he claims that his connection with the Lotz cases began or as to how and why it was continued. * * * I cannot find any plausible reason why the respondent, as he claims, should have, on January 18, 1927, gone to Kirschner's office simply to get the file in the Lotz cases. On the day before, he had been quite content to learn over the telephone from some one in Kirschner's office the alleged facts in the cases, upon which he based his letter to Lobisch, and in which he recounted the facts of the alleged accident; more particularly is this so, when we consider that after January eighteenth until he abandoned the cases in about the middle of February, his anxiety to procure the file had so cooled as that he made no further effort to get it. The fact that having already been apprised of the details of the accident over the telephone, as he claimed, taken in conjunction with his statement that the only thing he expected to find in the file was Kirschner's own retainer, which he said would have contained the facts in these cases, his excuse for making this visit to the latter's office is a very lame one."

The referee was not impressed with the testimony of Bayme who is supposed to have accompanied respondent on his visit to Kirschner's office. Respondent failed to mention Bayme as his companion during his testimony before Mr. Justice WASSERVOGEL in the " Ambulance Chasing Investigation."

The report proceeds: " The respondent denied that he signed the claim letter * * * and that it was posted by Daniel Laulicht to Wolley, because it would have been useless to forward it to the fictitious person Lobisch; he admits he dictated the letter, but told his stenographer to sign his name to it and mail it to Lobisch, which, if true, of course, would create some atmosphere of sincerity to his participation as attorney in these framed up cases. But the respondent admitted that he signed the lease of his office at #305

Broadway * * * and that he also signed the letter withdrawing from the cases * * *. A comparison of these two admitted signatures with that found on the claim letter * * * convinces me that the respondent signed this communication, and I believe that, as Daniel Laulicht testified, it was posted to Wolley, and not to the fictitious Lobisch."

The referee points out that the arrangement between the Laulichts and Spiegel and Kirschner was that they were to pay Kirschner eight per cent of the fees received and were also to pay the expenses of the office. He, therefore, rejects as unsupportable respondent's claim that these individuals sought him out and agreed to pay him twenty per cent of the fee which these claims or actions would produce.

The report then states: " Furthermore, his conduct at the spurious physical examinations of the five claimants, in my judgment, shows him to have been an active participant in the whole scheme to defraud the insurance company in these cases. When, as he claimed, Benjamin Laulicht would not allow the one female claimant whom the respondent asked to describe to him the circumstances of the alleged accident, to tell him her story, because he, Laulicht, knew the conditions better than the claimant; when he allowed this man to give to the doctor the information respecting the injuries that each of the claimants was alleged to have suffered; when during which time he paid little or no attention to what was transpiring and talked with none of his clients as to the circumstances of the accident or the nature or extent of their injuries; when, as the respondent admitted, he heard a young girl, one of the claimants, who, according to him, was not more than nineteen years old, and, according to herself, was but sixteen or seventeen years of age at the time, announce to the doctor that she was twenty-eight or twenty-nine years old, and that he made no effort to call a halt on what must have been known to him to be a series of fraudulent representations, he showed to my mind, that he was an active conspirator in the scheme to defraud the insurance company. If he were an honest man he could not have believed the claims to be honest. If he were an honest man and found himself so imposed upon, he would have stopped the examinations, demanded an explanation from Kirschner, as well as from his clients, notified the insurance company, and made a thorough investigation of the whole matter with a view to submitting the evidence to the District Attorney. Any man of his intelligence and of his experience in negligence cases would have been certain that these alleged examinations were part and parcel of a scheme to defraud. But the evidence shows that he did

nothing until his interview with Lipton some days after, when he retired from the cases."

Of respondent's relations with Lipton, the referee reports: " If anything were wanting in the evidence to cause me to have any doubt of the guilt of the respondent upon the charges presented against him in this proceeding, it was removed by himself, when, on three separate and distinct occasions, during his testimony, he deliberately denied that he knew Lipton, had any recollection of him, or ever had any dealing with him before the time of the Lotz cases, and, thereafter, toward the close of the hearing, admitted that he had known Lipton some time before, and, as a matter of fact, had settled a negligence case with him in September, 1925. He could not account for his change of front, except in the most absurd manner. He said that ' nothing at all ' had refreshed his recollection on this subject until ' it flashed back to my mind.'

" It is too great a strain on one's credulity to be asked to believe that this respondent, against whom the serious charges made against him in this proceeding were inquired into last summer before Mr. Justice WASSERVOGEL, and who, during his presence at the inquiry, heard his activities with Lipton in these cases testified to, and who must have known that his conduct therein would be the subject of investigation at a later period, did not, until almost the end of this hearing, recollect that he had known Lipton nor that he had had any business dealing with him before the Lotz cases. Such a story as that surpasses belief, and I am firmly of the opinion that he deliberately lied upon each of the occasions when he denied either acquaintance or dealing with Lipton. It must have been perfectly clear to the respondent that his former acquaintance and dealing with Lipton would be an important link in the chain of evidence against him in this proceeding, and he, therefore, without any regard for the truth, took a chance that his denials of these facts would carry conviction with them. His subsequent admission shows that when his interests are at stake he has little, if any, regard for the truth, and, in my estimation, stamps the rest of his testimony as utterly unworthy of belief."

The report of the referee points out the relation of dates of the physical examination, the arrest of the Laulichts-Spiegel-Kirschner group, and the change of attitude in the Lipton reports, and respondent's withdrawal from the case.

Neither Lipton nor the doctor who conducted the physical examination of the fraudulent claimants was a witness before the referee.

We are mindful of the character of those testifying against the

respondent. The referee properly characterized some of them as " rascals." Notwithstanding this, we think there is ample proof in the record that respondent was a willing party to this attempt to defraud the insurance company

We concur in the finding of respondent's guilt made by the learned referee herein. The respondent should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.