In the Matter of SAMUEL KOPLETON, an Attorney, Respondent.

First Department, April 11, 1930.

*Isidor J. Kresel* of counsel [*Harold Harper, Irving Ben Cooper, Vincent P. Uihlein* and *Sidney Handler* with him on the brief], for the petitioners.

*Samuel Kopleton,* respondent in person.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department, on February 9, 1925.

The petition charges the respondent with misconduct as an attorney at law in asserting, prosecuting and settling certain alleged fraudulent claims for personal injuries; and with the solicitation of retainers in personal injury actions. Respondent answered denying the misconduct charged in the petition. The matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon. The learned

referee has duly reported and petitioners now move to have respondent adjudged guilty of professional misconduct and for such action as the court may deem proper.

The record discloses that from the latter part of 1925 until the month of February, 1927, room No. 914 at 305 Broadway was occupied by a syndicate engaged in the business of defrauding insurance companies by means of fictitious damage claims. The *modus operandi* of this syndicate is described in the referee's report as follows: " An inspection would be made of a selected section of the city and any defects in the sidewalks, vault lights, stairways or other parts of the premises, were carefully noted. This was the work of what may be termed the inspector.

" The next step in the process was for another person to stage a fall in front of a building so charted, the fall supposedly having been caused by the defect previously ascertained. In the technical terminology of the business this was designated as ' taking a flop ' and the person performing the operation, a ' flopper.'

" The syndicate had several of such floppers in its employ paying them weekly salaries graded in accordance with their skill and experience. An expert flopper would take numerous flops a day, and each flop laid the basis for a damage claim.

" The flopper would perform his stunt in public view so as to make sure of witnesses to the ' accident.' He would simulate more or less serious injuries and often have an ambulance summoned. Invariably he would give a fictitious name and address supplied to him in advance by the syndicate.

" After the flop a ' claim letter ' would be written to the owner of the premises, who, in most instances, would turn it over to his insurance carrier.

" In the resulting negotiations the insurance company would as a rule request a physical examination of the claimant, and here another branch of the service was set in motion.

" The syndicate employed several persons to submit to such examination —' taking the physical ' was the technical term. These were distinct from the floppers. They were persons who in the course of their practice attained a familiarity with the nature and symptoms of traumatic injuries and an ability to persuade the examining physician of the genuineness of their suffering. Before each examination they were informed of their assumed names and addresses, the circumstances of the alleged accident and the nature of their supposed injuries. They were paid three to five dollars for each ' physical.'

" If the claim was settled, a general release was prepared, executed by the fictitious claimant and acknowledged before an unknown

or non-existing commissioner of deeds, both names being forged by a member of the syndicate. At times suit would be instituted on these claims, mostly by the service of summons, sometimes accompanied by an unverified complaint. The complaint would be drawn by the stenographer who had ready forms for all classes of ' flop ' accidents.

" The correspondence with the defendants, negotiations for settlements and suits were conducted in the name of an attorney, and in the course of its brief career the syndicate used successively the names of several attorneys."

Respondent was associated with room No. 914, 305 Broadway, for about six weeks from the middle of November until the 26th of December, 1925.

It appears that on November 7, 1925, Daniel Laulicht, Benjamin Laulicht and William Spiegel executed a written lease of the room in question. The room consisted of an outer and an inner office. The inner office was equipped with two desks. Shortly after the engagement of the office Lillian Spitz was engaged as stenographer. She had had a previous acquaintanceship with Daniel Laulicht and also knew respondent.

Respondent's testimony is that he was admitted to the bar in February, 1925, and went to work for Benjamin Greller, an attorney. He left his employ in the summer and went to work for Samuel Schleimer, an attorney at 305 Broadway. Respondent testified: " My position with Samuel Schleimer was as managing attorney of his office. I was with Mr. Schleimer until the end of November, when Miss Cohen, who was a stenographer in that office and was quite friendly with me, told me that Miss Spitz worked for insurance brokers on the 9th floor, and that they had space and stenography service for a young lawyer, and asked me if I was interested in that proposition."

An interview with the Laulichts and Spiegel followed and an arrangement was made whereby respondent took one of the desks in the inner office of room 914. After discussion, on the door was painted " Law Office, Samuel Kopleton," and then lower down toward the right and in smaller lettering the names of the Laulichts and Spiegel. It appears that while respondent was associated with room 914 he continued with Mr. Schleimer and did not spend much time in room 914. On December 26, 1925, after one o'clock, he came down stairs from Mr. Schleimer's office, and, he testified, " * * * Miss Spitz was leaving for the day at that time. So she said she wanted to talk to me. I said all right. So we walked outside into the hall. This was outside of

the door, in the main hall that leads into all the offices. She said to me she is leaving. I said, ' Why? Don't you like the conditions around here? ' She said she does not like the atmosphere. I said, ' The Laulichts are nice boys; they are all about to be married and are certainly not bothering you.' She said, ' It is not that; it is not personal. I do not like the things that are going on in that office.' I said, ' What do you mean you do not like the things that are going on? ' She said to me, ' Well, I will tell you. They are sending out complaints in your name.' I said, ' In my name? ' And she said, ' Yes. They have different people, not the real people, the plaintiffs in the cases, take physical examinations in that office, and I cannot stay here any longer.' I asked her, ' Why didn't you tell me that before? ' She said she wanted to but could not get up the courage, that every time she made up her mind she simply could not get a chance and could not get the courage.''

Immediately thereafter respondent charged his office associates with what he had learned from Miss Spitz and the ensuing discussion ended in a physical encounter. Respondent that afternoon told Mr. Schleimer of the situation and was advised by him to see William Maloney of the Alliance Frauds Bureau, an organization maintained by a number of casualty insurance companies to detect fraudulent accident claims. On Maloney's advice no complaint was made to the office of the district attorney, and subsequently, also on Maloney's advice, respondent signed substitutions in matters where he had been named as attorney of record. It appears that while respondent was associated with room 914 he admittedly handled seven claims for personal injuries brought to him by the Laulichts and Spiegel. All of these were based on alleged acts of negligence of the same character, faulty maintenance of premises.

Miss Spitz's testimony shows that the facts as to alleged accidents were given to her by the Laulichts and she typed the complaints, being familiar with forms of complaints in negligence actions growing out of coal hole accidents, stairway cases, or, as she described it, '' just the ordinary form of negligence action.'' Her testimony is that all papers she drew up were put on respondent's desk. It is not clear that respondent actually received such papers or passed on them. Miss Spitz also testified to physical examinations had in room 914, undergone by persons other than the party supposed to have been injured. These were held during the day when respondent was not present.

The testimony of Daniel Laulicht is to the effect that respondent was the originator of the plan or scheme, and that the arrangement

between the respondent and the Laulichts and Spiegel was one of partnership and was actually carried out during the period of the respondent's connection with them. The other two, Benjamin Laulicht and William Spiegel, also testified. The referee said: " The testimony of the three men, who were examined separately, is so mutually contradictory that no credence can be attached to it." This court had occasion to consider testimony offered by the Laulicht group in other disciplinary proceedings growing out of the ambulance chasing investigation. The referee was justified in rejecting their testimony herein.

The referee in his report states: " On this most vital phase of the charges, the question of the respondent's guilty knowledge of and active participation in the fraudulent operations above described, I find that the petitioners have failed to establish a case."

In their brief on this motion the petitioners admit: " It is true that there is no direct evidence of a satisfactory sort showing the respondent's knowledge of, or his conspicuous participation in, the frauds of the Laulichts and Spiegel."

Although there is no direct evidence that respondent was knowingly a party to the schemes of the Laulichts and Spiegel, there are aspects of his relations with them which lead to the inference that he was, and for which he cannot escape condemnation. The facts surrounding the seven claims which he admittedly handled show they were all of the same character — injuries sustained by persons falling down by reason of faulty maintenance of premises. No claimant's story was supported by a witness. They were brought to respondent within the short space of six weeks. In the cases he settled he entered into the settlement without personal consultation with the claimant and relied solely upon the statement of the Laulichts or Spiegel that the claimant would consent to it. The releases were delivered to him by the Laulichts or Spiegel, and these were executed before the same commissioner of deeds. In three of these claims, the plaintiff's physician was the same person. Respondent states that he thought all the plaintiffs resided in one locality, and, therefore, went before the same commissioner of deeds. The same explanation is offered in connection with the physician. These features indicate that respondent was indifferent to the source and character of business coming to him at the beginning of his career.

Respondent did not hesitate to consent to the substitution of another attorney in connection with the claims where his name had been used by the Laulichts and Spiegel, although he had every reason to believe such claims were fraudulent. He claims

that he was motivated by good intention in this, as he acted on the advice of Maloney.

There is no excuse, however, for his failure to advise Louis L. Katz, another attorney, in December, 1926, of the character of the Laulichts and Spiegel, when they were seeking trial counsel. The association of Katz with these individuals is the subject of disciplinary proceedings involving Katz. (*Matter of Katz*, 229 App. Div. 103.)

There is a conflict in the testimony of some of the witnesses given before Mr. Justice WASSERVOGEL in the ambulance chasing investigation with that given by the same witnesses before the referee. The referee said: " While there is no direct proof against the respondent of tampering with these witnesses, the inference is almost inevitable that these witnesses were reached by somebody in his behalf." Proof of any attempt to influence a witness would justify the severest discipline. In the absence of evidence that respondent was a party to any such attempt, we cannot hold him responsible therefor.

Respondent's association for six weeks with this group of criminals was at a time when he was but twenty-three years of age and in the first year of his practice at the bar. It may be that age and experience had not yet taught him to discriminate. His failure to warn a fellow attorney, however, one year after severing his relations with the notorious group described, of the danger involved in association with them, demonstrates an indifference to professional obligations which cannot be overlooked.

We think that respondent was guilty of gross carelessness in allowing his name to be placed upon the door of a law office with that of other persons thereon, without exercising any care or supervision of what went on in that office. We think he prostituted his profession by allowing a gang of scoundrels to use his office as an attorney from which to conduct their swindling operations in his name. We cannot accept the theory that he was an innocent victim of schemers. We think he participated therein until he found it unsafe to continue further. We deem him utterly devoid of the regard for ethical conduct which should characterize a member of the bar, and believe that he should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.