In the Matter of MOSES COHEN, an Attorney.

First Department, May 29, 1930.

*Isidor J. Kresel* of counsel [*Earl B. Barnes* and *Irving Ben Cooper* with him on the brief], for the petitioners.

*Hieronimous A. Herold,* for the respondent.

DOWLING, P. J. Respondent was admitted to the bar on December 6, 1922, at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department.

He is charged with having participated in a scheme and conspiracy to defraud indemnity insurance companies by assertion, as attorney, of baseless claims for personal injuries.

During the course of the hearings before the referee to whom this matter was referred after respondent had answered the petition herein, additional charges were filed against respondent to the effect that he had induced witnesses to testify favorably to him, and contrary to prior unfavorable testimony given by such witnesses, before the grand jury of New York county.

In the latter part of 1925 Irving Fuhr became acquainted with Daniel Laulicht, through Benjamin Deutsch. This trio, with others, engaged in the business of developing fraudulent claims. Some of the operations of the group have been referred to by this court in *Matter of Kopleton* (229 App. Div. 111); *Matter of Katz* (Id. 103); *Matter of Sprung* (Id. 501). Selected parts of the city were visited and careful search made in the neighborhood for defects in sidewalks, vault lights, stairways and other parts of various premises. One of the group would simulate a fall at the defective site chosen. In the terminology adopted by these conspirators, such a performance is called a " flop," and the person falling is termed a " flopper." Irving Fuhr became a " flopper."

About September, 1925, respondent became acquainted with Daniel Laulicht, who seems to have been the leader of the group. The details and occasion for this meeting are matters of dispute. In any event, through hearing Laulicht speak of respondent, Fuhr came to know him. After some kind of argument with the Laulichts, and desiring to work for himself, Fuhr went to respondent in about December, 1925. Fuhr testified: " I told him I was working with the Laulichts and I wanted to go out for myself on these flops and would he handle these cases for me and we made an agreement

on a fifty fifty basis." Fuhr's testimony is that about a week after this conversation he commenced his " flops " under the agreement with respondent. He was accompanied by Benjamin Deutsch. The testimony of Benjamin Deutsch is that he and Fuhr reported to respondent two or three times a week, calling at respondent's office after business hours at respondent's suggestion. In these reports they gave respondent the address, and described the defect or the hall or store, wherever the fall had taken place, the time, and how Fuhr fell, going in or coming out. If an ambulance had been called, they gave the name of the hospital that had answered the call; if there had been no ambulance respondent was so informed. Sometimes they supplied the name of the claimant, but in many instances the name of the claimant was not furnished. There is a record of some seventy-five " accidents " in about a month. Suits were instituted and settlements effected, based on some of the " accidents."

The time came when Fuhr and Deutsch had a disagreement with respondent. Deutsch testified: " We told him [respondent] that we were being gypped out of money that was coming to us in some cases that we believed were settled. Mr. Cohen said we were not being gypped. Fuhr spoke up and said we were and mentioned some case, which I don't remember, which should have been settled. We had an argument and went out." Fuhr and Deutsch went to Laulicht with their troubles. Laulicht went with them to respondent and as a result of demands made upon respondent, he signed stipulations substituting other attorneys in his place in the claims brought to him, with the exception of some few cases in which settlements were pending. In the place of respondent there were substituted attorneys then operating with Laulicht.

The following is an extract from respondent's testimony as to his relations with the Laulicht, Fuhr and Deutsch group: " About September, 1925, Daniel Laulicht came into my office and told me he was a process server; he told me he was a process server; that he wanted me to give him whatever summonses I had for service; that he makes very good services. At that time, I had a man by the name of Harry Hurtz making service of summonses for me. Mr. Hurtz was a very accurate process server but very slow. I gave some summonses to Mr. Laulicht at that time.

" A short while thereafter, probably a week had passed since this first interview, I saw Daniel Laulicht outside in my office. I asked him whether or not he had served any summonses and he told me he wanted to see me privately about something else. I took him into my private office and he told me that his real business is not that of process server but he is an ambulance chaser; that

he brings cases to lawyers for commission and, sometimes, when he hears of a good lawyer, he comes into this man's office and poses as a process server in order to observe the man's demeanor and get an insight as to how the man conducts himself and manages things and he suggested that if I were to take cases from him we could make some money together. I told him I wasn't interested. He said, ' You are a young man and struggling on ' and I said ' I thank you but I will continue to struggle along.' He said, ' I have a proposition to make to you; I am about to take an office in this building; I want you to come downstairs and occupy my office. We will put your name on the door, give you a stenographer and pay you a drawing account of $50.' I told him I wasn't interested in that proposition. After that he left. * * * At that time, I told him as long as his business wasn't that of process server I wanted the summonses back and I wouldn't give him any more for service. After that the man did not come into my office. I never had any conversation with him or any dealings with him. I saw him occasionally in the building.

" After a couple of months had passed, a man by the name of Irving Fuhr came into my office and told me he had been injured in an accident; that he wanted to retain me as his attorney; I took a statement of the facts from him; I asked him how he happened to come into my office and he mentioned the fact to me that a friend of his — a man by the name of Mr. Goldberg — had recommended him. I have a client by the name of Goldberg. After I had been retained, I called him up to thank him for recommending that case to me; I didn't get Mr. Goldberg on the wire but his partner, Mr. Ehrlich, and Mr. Ehrlich said to me, ' It's all right; probably Mr. Goldberg sent him down but knows nothing about it,' and I never went any further into this matter. I investigated the case and felt well pleased with the facts as I found them; I found there was an ambulance surgeon's report; that he was treated at the scene of the accident; that a record was made of the accident at the police station.

" Some time thereafter, Fuhr told me that a friend of his had been injured in an accident and he wanted to recommend the case to me. I told him I would be glad to take his friend's case. Mr. Fuhr gave me his name and address and I went down to Lewis Street and there I was retained by Bernard Deutsch in his accident case. At the time I called, Mr. Deutsch was in bed. I took a statement of the facts from him and made my investigation and found he had been treated by an ambulance surgeon at the scene of the accident and that a record of this accident was made at the police station.

" About this time, Mr. Fuhr had recommended probably one or two other accident cases and one of the plaintiffs in another case recommended another case; in other words, there was a circle, one client recommended another client, and that's how I happened to be retained in the cases mentioned in this proceeding, outside of the case in the name of Storch; that case has no connection in any way. * * *

" About this time — I cannot be accurate as to the exact date — Daniel Laulicht came into my office. When I saw him there, I said, ' What is it I can do for you? ' He was all smiles. He said, ' You owe me money.' I said, ' What for? ' He said, ' I sent in certain cases to you.' I said, ' You never sent in any cases to me ' and he said, ' I certainly did,' and mentioned the names of six or seven or eight cases; I said to him, ' This is something new to me.' I said, ' I think you better come back and see me some other time; I am very busy.' He said, ' When? ' I said, ' In two or three days.' I immediately wrote letters to the plaintiffs in the cases he had mentioned; the next day, Laulicht came into my office, it was a day or two later, and used very abusive language and said, ' What do you mean by writing letters? I will show you where you get off.' I said, ' I practice law here and don't want anybody to come in and yell at the top of his voice; you better come back at 6 o'clock and I will talk .to you and find out what you want; ' he said, ' I will come back at 6 o'clock.' "

Meanwhile, respondent testified, he arranged· to have private detectives present to protect him from bodily harm. Laulicht returned, and respondent's testimony proceeds: " I heard a noise in the outer office. * * * I went outside and found the office was crowded with a good many people and, at the head of them, I could see Daniel Laulicht and his brother. I became very nervous and ran into my office and said to the detective, ' What shall I do? ' I told Daniel Laulicht to come into my office. Daniel Laulicht walked in. * * *

" At the time I ushered him into my office in the presence of these two private detectives, I told him I do not employ ambulance chasers, will not pay commissions or recognize him; he immediately turned about and fled from the office; all the people went with him. A couple of minutes later, a telephone call came in and I recognized Daniel Laulicht's voice over the telephone and he said to me, ' Now, Cohen, I know you have detectives up there.' I said, ' You are mistaken, they are clients of mine to see me on some real estate matter.' He said, ' Anyway, I am a very patient fellow; when I go out to get a man, I get him, if I wait a week; you always won't be protected by detectives.'. I said, ' Don't be foolish; you

wait and see these people leave my office and come right back.' The two gentlemen left and then Daniel Laulicht and the people with him came back to my office. Daniel Laulicht came into my office and with him I recognized one of the plaintiffs in one of the actions I had started. I turned to this man and said, ' Do you know Daniel Laulicht? ' He said, ' Yes.' I said, ' You retained me in your accident case.' He said, ' Yes.' I said, ' Daniel Laulicht is demanding commission for the case having come into my office.' He said, ' If it weren't for Daniel Laulicht, you wouldn't have the same.' I said, ' He is also trying to tell me what to do in the matter.' He said, ' Daniel Laulicht is boss.' I said, ' If that's the case, I refuse to have anything to do with you or your case and demand you have another attorney take this up for you in your behalf.' When I said that, Laulicht became very abusive; he used language which does not bear repetition in this Court. He said, ' You have to continue this case.' I said, ' I will not; I refuse to have anything to do with you or friends of yours; I will not have anybody coming in here and saying they chase cases for me.' Things became worse, and, finally, he said, ' All right, I will get substitutions for you.' Then, he said, ' Why don't you finish up these cases? ' I said, ' I won't have anything to do with this plaintiff, a man who tells me you sent him and I know nothing about it.' He became very abusive and cursed. He said, ' I will knock you down so hard it will take you a year to get up.' As he said that, Mr. Dolen came in and stood astraddle of the door and said, ' Who is going to beat my friend Moe? ' and Laulicht became very uneasy. At this time, a son of a client of mine happened to come in to interview me; this man is a hugely built fellow and was a member of Manuel Training football team; the door of my office was open and some people of Daniel Laulicht's gang were outside; when this fellow suddenly came in, here was Dolen standing with fists clenched and arms spread out. Daniel Laulicht looked from one to another. He says, ' I will ask you to let me use your telephone, I want to call up Kid Flowers.' I said, ' Why, Kid Flowers was supposed to be here.' I never heard his name mentioned; I made a show and winked to Dolen and Dolen said, ' Sure, he was supposed to be here.' I said, ' I will give you his telephone number.' Laulicht said, ' What do you want? ' I said, ' I want these cases to get out of my office; I don't want anything to do with them.' The substitutions came to me then and I signed them.

" Some time thereafter, there was another case I took up for settlement. In that case, there was an offer of $25. I wrote the client a letter that I had taken the case up for settlement; that the offer was very unsatisfactory and that I preferred to try the

case rather than settle it; my client told me to see what I could do; I subsequently increased that offer to $50; then my client told me he could not go to trial; he would rather settle for $50, because he was leaving town; with regard to the execution of that release, I have no recollection. * * *

" I don't remember the name of the case, except I know it was against some beer company. About a day later, Laulicht comes into my office once more and says, ' Now, you owe me some money.' I said, ' How.' He said, ' You settled a case for $50.' I said, ' How do you know about it? ' He said, ' Never mind; I want commission on that case.' I said, ' Is that one of your cases? ' He said, ' Yes.' I said, ' There will be no check for you or your client or anybody else. I never took that check from the insurance company.' At that, Laulicht became incensed and said, ' I will tell you something that will surprise you.' I said, ' What is it? ' He said, ' You have some more of my cases,' and I said ' What are they? ' He mentioned five or six more cases. I was very much surprised. I said, ' How are these cases yours? ' He said, ' Never mind; they are my cases and I want substitutions,' and became very threatenting and abusive and said, ' Another thing, this time; there will be no after 6 o'clock business so that you can get private detectives and have huskies come up here.' He threatened and intimidated me at the time; I told him to get up the substitutions and I would sign them; they were gotten up and I signed them and disconnected myself from those cases."

Respondent's story does not bear investigation. He admits that there came to him through Fuhr, Deutsch or their friends, about thirteen or fifteen cases in which he signed substitutions. Files in some eight of these were produced. The date of the earliest injury in these was December 7, 1925, and the latest December 29, 1925. The first summons is dated December 11, 1925, and the latest January 12, 1926. Within this short period of time, the remainder of these thirteen or fifteen cases were received. All of the thirteen or fifteen cases were for personal injuries sustained by reason of defects in or about certain premises.

Respondent insisted that he made a thorough investigation of each of these matters before he instituted suit, and convinced himself that each one was meritorious, legitimate and *bona fide;* that he interviewed each client at least twice, and communicated with them. He was unable to describe a single one of these claimants. Notwithstanding his insistence that he believed the claims to be genuine, there was no hesitation on his part about signing substitutions and turning over the files to Laulicht whom he knew to be an ambulance chaser. He had had disbursements in these

matters, but at the time of the first substitution nothing was said about them; he would have us believe that he wrote to his clients before the first group of substitutions, but, accepting his own testimony as to the sequence of events, not sufficient time had elapsed to allow his clients, had they been *bona fide,* to respond when such substitutions were made. There is no pretense as to communicating with clients made with reference to later substitutions. Respondent's testimony is that the only reason he had to believe that these cases had come from Laulicht was Laulicht's own statement to that effect. This ready acceptance of such a statement can only be ascribed to knowledge that Laulicht was in fact the " boss." Respondent's plea of fear of physical violence is ridiculous in view of his own testimony as to his arrangement for protection by private detectives.

In February, 1927, the district attorney of New York county seized the records of the office in which Laulicht was then located. Among those records was a large note book. The testimony is that the entries in this note book were made by Fuhr and Deutsch. Such testimony is supported by that of a handwriting expert who testified that no other handwriting appears therein. The entries consist of details of the " flops " or falls simulated by Fuhr and Deutsch. Their testimony is that originally they kept a small note book, but it became filled in the course of two weeks, and they decided to make the entries in a larger book. The notations in the small note book were copied into the larger book and from that time on " flops " were recorded in the large note book. Their testimony is that they referred continuously to the note books when reporting to respondent; at times they read the details directly out of the book to respondent; that they supplied respondent with an accident case for each and every " flop " noted in their book. Among the entries is one covering an " accident " at 1742 Amsterdam avenue. The date is given as December 29, 1925, and the owner is named as Daniel Reeves. There was produced from the office of the clerk of the Municipal Court, Borough of Manhattan, Second District, a summons in an action wherein Jacob Wasserman sued Daniel Reeves, Inc., for personal injuries alleged to have been sustained by the plaintiff by reason of the careless and negligent maintenance of premises at 1742 Amsterdam avenue, on December twenty-ninth. Respondent is attorney for the plaintiff.

Another entry covers an " accident " at Joe's Restaurant, 10 Delancey street, New York city, on December 8, 1925. The injured is named as Harry Schneider, 1470 Thirty-ninth street, Brooklyn, and the entry contains the notation, " broken doorstep — broken platform." From the office of the clerk of the Municipal

Court, Borough of Brooklyn, Fourth District, there was produced a summons in an action wherein Harry Schneider sued Michael J. Adrian Corporation. This summons carries the indorsement, " action for personal injuries sustained by plaintiff due to carelessness and negligent maintenance of premises No. 10 Delancey St., of which defendant is owner of record. Accident occurred December 8, 1925." Respondent is attorney for the plaintiff.

Summonses were produced from official sources showing respondent as attorney for the plaintiff in suits brought to correspond with entries in the Fuhr-Deutsch record book covering " accidents " at 476 Sixth avenue, Manhattan, on December 9, 1925; 273 Sixth avenue, on December seventeenth; 1277 First avenue, Manhattan, December 25, 1925; 167 Canal street, December 26, 1925.

The learned referee found that " * * * After careful consideration of all the testimony and drawing such inferences as seem natural, I can arrive at no other conclusion than that the respondent knew when he instituted suits on the various claims given him by Fuhr and Deutsch, that the claims were fraudulent both as to actual events, which were the bases of the claims, and in some instances as to the very existence of the plaintiffs."

He also said: " The testimony of Fuhr and Deutsch, together with the entries in the memorandum book kept by them, justify the finding that all these cases were fictitious in fact, and that save in the Deutsch and Fuhr cases the plaintiffs were non-existent, or were persons whose names were used for convenience only; the actual persons having had no part in the transaction.

" The respondent accepted these cases and instituted suit in pursuance to the general scheme planned with Fuhr and Deutsch. * * *

" To an attorney who had so little litigated practice as had the respondent this sudden influx of cases, all for personal injuries suffered by defects in or about certain premises would of itself raise suspicion of their *bona fides*, were he not involved in a more serious way."

Following the raid on the office where Laulicht was located in February, 1927, respondent was called before the assistant district attorney of New York county, who was conducting the investigation into the operation of the Laulicht group. Respondent was asked to tell what he knew about Laulicht and certain negligence cases. Following this appearance in the district attorney's office, respondent destroyed all papers in his possession in any way related to negligence matters in which Laulicht, Fuhr, Deutsch and their group claimed any interest. He also destroyed his check books and vouchers. His testimony is that he destroyed these records

after he had been told by the assistant district attorney that his record was clear and he had nothing to fear, and he was so disgusted with his connection with these matters that he did not like to see them around when he found out what it was about. The assistant district attorney was not called to support respondent, nor were the insurance company representatives called, who, respondent testified, were present when he was interrogated at the district attorney's office and told he had nothing to worry about.

The destruction of these records at a time when the Laulicht group operations were under investigation and when there was much agitation for an investigation of the whole ambulance chasing situation, leads to only one conclusion, that is, that respondent desired to rid himself of the incriminating evidence which his papers contained.

The referee found respondent guilty of the charges that with knowledge of the facts that the claims were false and fraudulent, the respondent instituted suits therefor and negotiated settlements thereof. This finding of the referee is supported by the overwhelming weight of the evidence herein.

The record, in reference to the charges of subornation of perjury made against respondent during the course of the hearings before the referee, shows that in July, 1928, in the Ambulance Chasing Investigation before Mr. Justice WASSERVOGEL, the testimony of Irving Fuhr as to respondent's participation in these fraudulent claims was certain and positive. In September, 1928, Fuhr was called to the district attorney's office in New York county in connection with the investigation being made of the participation of respondent and other attorneys in fraudulent schemes as disclosed by the Ambulance Chasing Investigation. Prior to Fuhr's going to the district attorney's office, respondent called on him at his home in Brooklyn. Fuhr testified that respondent urged him to change his testimony as given before Mr. Justice WASSERVOGEL so that it would be in his favor; that respondent said he would take care of him, and he would not be sorry; that in case of trouble he would have a lawyer and furnish bail. Respondent's testimony is that he called on Fuhr to urge him to tell the truth. Fuhr appeared before the assistant district attorney, but did not change his testimony. Respondent again called on Fuhr. Fuhr's testimony is that respondent said he yet had time to change his story so that it would be in favor of respondent. Fuhr was then called before the grand jury of New York county. He changed his story. Thereafter he was indicted for perjury, pleaded guilty and received a jail sentence. Following his arrest on the perjury charge bail was furnished for him in the sum of $5,000. The security for the bail

bond is a deed of property standing in the name of respondent's mother and in which property she lives. Fuhr's testimony is that respondent also engaged counsel for him. Mrs. Mary Fuhr, the wife of Irving Fuhr, testified that at the beginning of the fall of 1928 respondent called to see her husband at their home in Brooklyn a number of times. On one visit he took her to a store and bought her a coat, and on another visit he brought a set of dishes to her home. There is also testimony of payments of money to Fuhr. Respondent admits his visits to Fuhr and the gifts to Mrs. Fuhr. He explains the gifts to Mrs. Fuhr as follows: " * * * I thought that this was a situation that required very great care in handling because here I had a very antagonistic witness and the only way I could get him to talk was through his wife; that's why I did that."

It appears that, following Fuhr's testimony in the Ambulance Chasing Investigation, respondent's brother obtained a statement from Fuhr in which Fuhr pictures Laulicht as respondent's oppressor. The statement in itself is of no value. The method of obtaining it is the point of interest now. Respondent's brother would have us believe that on his own initiative, and without the knowledge of respondent, he went to Fuhr after reading in the newspapers of his testimony before Judge WASSERVOGEL in the Ambulance Chasing Investigation. Respondent's testimony is that he did not learn of the statement until after his last visit to Fuhr.

After the hearings herein were apparently closed, and while the matter was being considered by the referee, respondent requested an opportunity to present further testimony. His mother was called. Her explanation of the deed, given as security for Fuhr's bail bond, is that about a year before her testimony a stranger called at her home and she signed a paper, the nature of which she did not know, through fear instilled in her by the stranger. There were produced the application for the bail bond, a confession of judgment, and the blank warranty deed given as security. The agent who wrote the bond testified as to the application for the bond: " * * * there were four or five people came into the office about a bond they had up in the First District Court; the first thing I inquired what security they got; they told me a piece of property in Brooklyn; I told them I could not go to Brooklyn; as I recollected, one of the boys — whether he came in with them, I can't tell — came in and I asked him whether he would go to Brooklyn and get a deed and have the people sign it, which he did; he came back and brought the deed along and brought the papers up to me and on that deed and application I wrote the bond." His testimony is that he did not know any of those who came in to his office in connection with the application for the bond and has not seen any of them since. The

man who took the acknowledgment to the deed testified that the agent asked him to go to Brooklyn and take the papers and have them signed; that he went to Mrs. Cohen's, and although she was very reluctant to do so, she finally signed. His testimony in part is as follows: " I told her they were papers to sign for the insurance company; she was very reluctant; I told her I wasn't being compensated for this; I was in a hurry and ready to leave; she called me back and said, ' I will sign these for you and take them back.' " There is nothing suggesting intimidation. The application contained information as to the valuation and mortgage on the property which the notary obtained from Mrs. Cohen and which could only be obtained if she were disposed to give it.

The referee doubted that a jury would convict the respondent of having induced Fuhr to commit perjury and he was unwilling to make such a finding. The referee said: " Whether Fuhr was induced to make this change in his testimony through the more or less natural solicitation of the respondent's relatives or through the officiousness of friends, or through the respondent's own efforts, is left too much to inference. I prefer to give the respondent the benefit of the doubt and I recommend a dismissal of this charge."

We think that the record clearly indicates that respondent was the inducing cause for Fuhr changing his testimony before the grand jury. The efforts of respondent's brother were in themselves highly suspicious; it is improbable that they were unknown to respondent. Respondent's own visits to Fuhr could have no purpose other than to try to persuade Fuhr that it would be to his advantage to testify favorably to respondent. The gifts to Fuhr's wife were part of respondent's persuasive efforts. The furnishing of security for the bail bond eliminates all doubt on this charge. It is improbable that the signature of respondent's mother could be obtained to the application for the bond, the confession of judgment and the blank warranty deed, unless there was some prearrangement of which respondent had knowledge. Respondent's last minute demand upon his parent to give the testimony she did is indicative of his character. In respondent's brief an attempt is made to relieve the respondent of the effect of this furnishing of bail by the following argument: " If members of respondent's family took it upon themselves to furnish bail for Fuhr, the same as Jack Cohen [respondent's brother] took it upon himself to interview Fuhr, that fact should not be attributed to the respondent. There is absolutely no evidence outside of Fuhr's testimony connecting the respondent with Fuhr's bail." This is ridiculous.

The charge as to subornation of perjury involving Bernard Deutsch was not developed to any great extent. The referee makes

no reference to it in his report and it is not stressed by the petitioners on this motion. It must be considered as having been abandoned.

The record further discloses that while the Ambulance Chasing Investigation was being conducted, respondent absented himself from his office and remained beyond the jurisdiction of the court. Efforts were made to subpœna him. Respondent's explanation is that he suffered a nervous breakdown and was under the care of his uncle, a physician in New Haven, Conn. This physician was not called. The testimony offered to support respondent's claim of ignorance of the progress of the Ambulance Chasing Investigation, or of the efforts being made to secure his attendance thereat, is not convincing. We are satisfied, from the record, that respondent deliberately avoided his duty, as an officer of the court, to co-operate with the court in the efforts being made to rid the legal profession of the ambulance chasing evil, and that he was actuated by the sole motive of being spared the ordeal of having to disclose his own participation therein.

The respondent has been guilty of gross and continued unprofessional conduct, and should be disbarred.

MERRELL, FINCH, McAVOY and SHERMAN, JJ., concur.

Respondent disbarred.